SEALED

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

United States of America,

          Plaintiff,

v.

Jian Zhang,

          Defendant.

Case Number:

**(Filed Under Seal)** *18-7298 MJ*

## CRIMINAL COMPLAINT

I, Christopher Todd, the complainant in this case, being duly sworn, state that the following is true to the best of my knowledge and belief.

## COUNT ONE

Beginning on or about May 29, 2018, and continuing through on or about July 17, 2018, in the District of Arizona and elsewhere, the defendant, Jian ZHANG, knowingly bought two M4 rifles, two Carl Gustaf M4 recoilless rifles, and six M320 grenade launchers, prior to exportation, knowing them to be intended for exportation without a license contrary to the Arms Export Control Act ("AECA"), Title 22, United States Code, Section 2778, and the International Traffic in Arms Regulations ("ITAR"), Title 22, Code of Federal Regulations, Parts 120, *et seq.*, laws and regulations of the United States.

All in violation of Title 18, United States Code, Sections 554(a) and 2.

## COUNT TWO

Beginning on or about June 13, 2018, and continuing through on or about July 16, 2018, in the District of Arizona and elsewhere, the defendant, Jian ZHANG, did knowingly transfer and transmit, or cause the transfer and transmission of, approximately $56,995.00 in United States currency from a place outside of the United States, i.e., the People's Republic of China, to a place inside the United States, i.e., Arizona, with the intent to promote the carrying on of specified unlawful activity, to wit, knowingly exporting or smuggling items from the United States contrary to laws and regulations, in violation of Title 18, United States Code, Section 554(a).

All in violation of Title 18, United States Code, Section 1956(a)(2)(A).

I further state that I am a Special Agent with U.S. Immigration and Customs Enforcement, Homeland Security Investigations (HSI) and that this complaint is based on the following facts:

**See Attached Statement of Probable Cause Incorporated By Reference Herein.**

Continued on the attached sheet and made a part hereof:  ☒ Yes  ☐ No

AUTHORIZED BY: Todd M. Allison, AUSA

HSI SA Christopher Todd
_____
Name of Complainant

Signature of Complainant

Sworn to before me and subscribed in my presence

8/16/18 @ 3:30 p.m.
_____
Date

at   Phoenix, Arizona
_____
City and State

HONORABLE BRIDGET S. BADE
United States Magistrate Judge
_____
Name & Title of Judicial Officer

Signature of Judicial Officer

2

## STATEMENT OF PROBABLE CAUSE

I, Christopher Todd, being duly sworn, hereby depose and state as follows:

1.     I am a Special Agent with U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) and have been so employed for approximately 12 years.  Prior to my current employment with HSI, I was a State Trooper with the Florida Highway Patrol for approximately five years and a State Officer with the Florida Department of Environmental Protection for approximately two years.  As a requirement for employment as an HSI Special Agent, I successfully completed a 24-week criminal investigator training program located at the Federal Law Enforcement Training Center in Glynco, Georgia.

2.     As a Special Agent with HSI, my duties include, among other things, the investigation of financial crimes and schemes involving the laundering of money through financial institutions.  I have received specialized training on techniques to detect money laundering and financial crimes and am familiar with various types of schemes of those who launder money, or employ to conceal and launder illicit proceeds as proscribed in 18 U.S.C. § 1956.

3.     As a Special Agent with HSI, my duties also include the investigation of criminal violations of import/export laws and violations of the Arms Export Control Act ("AECA") as proscribed by 22 U.S.C. § 2778, and the International Traffic in Arms Regulations ("ITAR"), as proscribed by 22 C.F.R § 120, *et seq.*  Moreover, as an HSI Special Agent, I am generally authorized to investigate violations of the laws of the United States.

4.     Your Affiant is also familiar with 18 U.S.C. § 554, which makes it illegal to buy any merchandise, article, or object, prior to exportation, knowing the same to be intended

for exportation contrary to any law or regulation of the United States. Furthermore, I know that 22 U.S.C. § 2778 and 22 C.F.R §§ 121.1 and 123.1 make it unlawful to export U.S. Munitions List items from the United States without prior approval from the United States Department of State, Directorate of Defense Trade Controls (DDTC).

5.     This affidavit is based upon information I gained through training and experience, as well as information related to me by other individuals, including other law enforcement officers. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause sufficient for the issuance of a criminal complaint, I have not included each and every fact known concerning this investigation. For the reasons set forth below, I assert there is probable cause to believe that Jian ZHANG ("ZHANG") has violated Title 18, United States Code, Section 554 (Smuggling, or Attempting to Smuggle, Goods from the United States) and Title 18, United States Code, Section 1956(a)(2)(A) (International Money Laundering).

## EXPORT LAWS AND REGULATIONS

### A. The Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR).

6.     In "furtherance of world peace and the security and foreign policy of the United States" the United States regulates and restricts the export of arms, munitions, implements of war, and defense articles, pursuant to the AECA, 22 U.S.C. § 2778. Such exports are governed by the International Traffic in Arms Regulations (ITAR), 22 C.F.R. §§ 120-130. The ITAR implements the provisions of the AECA, and establishes the

framework for regulating the export of defense articles. The DDTC is responsible for administering the ITAR.

7.      The ITAR contains the United States Munitions List (USML), 22 C.F.R. § 121.1. Items and services listed in the USML are deemed "defense articles" and "defense services," and are subject to the ITAR. The USML sets forth twenty-one categories of defense articles that are subject to export licensing controls by the DDTC, ranging from firearms parts to military equipment to missiles. 22 C.F.R. § 121.1.

8.      The ITAR defines an "export" as, among other things, the sending or taking of a defense article out of the United States in any manner. Unless an exemption applies, the AECA and the ITAR prohibit all defense articles or defense services from being exported from the United States without a license from the DDTC. 22 U.S.C. § 2778(b)(2); 22 C.F.R. § 123.1.

9.      The AECA establishes criminal penalties for any willful violation of the AECA or the ITAR. 22 U.S.C. § 2778(c). Under the ITAR, it is unlawful to willfully export or attempt to export from the United States or conspire to export, import, or cause to be exported, any defense article for which a license is required without first obtaining the license. Additionally, no person may willfully cause, or aid, or abet, counsel, demand, induce, procure, or permit the commission of any act prohibited by the AECA or the ITAR. 22 C.F.R. § 127.1(a)(1).

10.      Pursuant to the ITAR, the People's Republic of China (the "PRC") is an arms-embargoed country. Specifically, Section 126.1(a) of the ITAR states, "It is the policy of the United States to deny licenses or other approvals for exports and imports of

3

defense articles and defense services, destined for or originating in certain countries."
Section 126.1(d)(1) expressly states that the United States has "a policy of denial" for
"defense articles and defense services" to the PRC.

**B.    Smuggling Goods from the United States**

11.    Pursuant to 18 U.S.C. § 554(a), it is unlawful to buy any merchandise, article,
or object, prior to exportation, knowing the same to be intended for exportation contrary to
any law or regulation of the United States.

**C.    International Money Laundering**

12.    Pursuant to 18 U.S.C. § 1956(a)(2)(A), it is unlawful to transport, transmit, or
transfer a monetary instrument or funds to a place in the United States from or through a place
outside the United States with the intent to promote the carrying on of specified unlawful
activity. Pursuant to 18 U.S.C. § 1956(c)(7)(B)(v)(I), smuggling violations involving an item
controlled on the USML established under Section 38 of the AECA constitute specified
unlawful activity.

**PROBABLE CAUSE**

13.    On or about May 7, 2018, HSI received information from an Industry Source
of Information (the "IS") regarding a suspicious contact with a subject, an unnamed co-
conspirator (the "CC"). The IS stated that the CC called the IS and requested information
on exporting four M16 rifles, two "Gustaf" rocket launchers with sights and shells, and two
Trijicon Continuously Computed Aiming Solution (hereafter, "CCAS") scopes to Hong
Kong. The CC told the IS that the items were to be shipped to an intermediary in Hong
Kong, but the ultimate destination was the "Hong Kong Secret Police." The IS informed

4

the CC that United States laws and regulations prohibit the PRC, to include Hong Kong, from receiving United States munitions. The IS reported that, after the IS advised the CC of that information, the CC started "ranting" to the IS, stating that "people" send prohibited items to China all the time by labeling the items as "toys."

14.     After reporting the contact to HSI, the IS agreed to introduce an undercover law enforcement agent (the "UC") to the CC as a business associate who could assist the CC with the export. The UC recorded a three-way call between the UC, the IS, and the CC, during which the IS made the introduction. The IS informed the CC that the UC was an arms exporter from Phoenix, Arizona, whom the IS had met at various gun shows in the past.

15.     I know that the IS's company is an export company that specializes in legally exporting firearms and their accessories. The IS is registered with the DDTC as a broker and is well versed on ITAR and the AECA. The IS has been exporting firearms for approximately five years. The IS is not a registered informant with the Department of Homeland Security and has not received any compensation for providing information in the past. All information provided by the IS has been reliable and has resulted in at least one other active investigation.

16.     On or about May 10, 2018, the UC received an email from emaxorders@gmail.com, used by the CC. Below is the body of the email to the UC from the CC:

[UC]

Thank you for your help!  I have a client in Hong Kong, He works in Procurement

5

for the Secret Police of Hong Kong (EUC) and in Hong Kong.

We need to Export 4 MI-6 -S.A. RIFFLES-SEMI-AUTOMATIC WITH SCOPES TO HONG KONG.   These I sourced through Tracking -point.com out of Pflugerville, Texas near Austin – Texas.

They also need 2 M-4 Gustav Rocket launchers with Sights and 4 shells as well as the procurement of 2 Trijicon –(CCAS) SCOPES Computerized controlled automation system scopes shipped to Hong Kong.  The end user –(EUC) is THE HK SECERT SERVICE POLICE.

[UC] MY DIRECT CELL NUMBER IS [Redacted] IF I DO NOT ANSWER AND IT ROLLS OVER PELASE TEXT ME!

MANY THANKS AGAIN!

[CC]
ELECTROMAX INTERNATIONAL
FEDERAL CAGE CODE: 3EEW3
HOUSTON, TEXAS

17.     On May 11, 2018, the UC emailed the CC and advised the CC that an export license would need to be obtained, along with a Department of State application to transfer military equipment or classified equipment out of the United States.  The UC also requested that the CC provide End User Certificate (hereinafter, "EUC") information to include the complete identities of all foreign consignees.

18.     On May 16, 2018, the UC initiated a recorded telephone call to the CC to discuss the order.  In summary, the CC told the UC that the CC had been in contact with the buyer, who informed the CC the weapons would be shipped to mainland China for use by the "Chinese Secret Police," instead of the "Hong Kong Secret Police."  The CC told the UC that the CC understood there were restrictions on shipping the U.S. munitions to China, but wanted to find a way to ship the items.  The CC asked the UC to purchase the

munitions and assist with the export, to which the UC agreed. The CC informed the UC that his "client" intended to travel to the United States and would bring cash to purchase the weapons. The CC advised that he (the CC) would collect a "commission" from the transaction and would introduce the UC to his "client" to help with the export.

19.     Later the same day, at approximately 3:09 p.m., the UC received an email from the CC. In summary, in the email, the CC requested a quote for two M4 semiautomatic rifles and six M320 grenade launchers. In the email, the CC stated that Hong Kong was the destination for the requested items.

20.     On May 18, 2018, the UC initiated a recorded call to the CC. During the conversation, the CC told the UC that the CC communicates with his "client" in China via WhatsApp messenger (hereinafter, "WhatsApp") and through email. WhatsApp is a messaging and social networking application used on a computer or smartphone. I know that WhatsApp is an encrypted end-to-end messenger service commonly used by individuals who are seeking to prevent eavesdropping or lawful interception by law enforcement.

21.     On or about May 20, 2018, the UC conducted several telephone conversations with the CC, all of which were recorded. In summary, during those conversations, the CC asked that the UC send him an invoice for the M4 rifles, the M320 grenade launchers, and other firearms. During those conversations, the CC identified his client by name as Jian ZHANG (hereinafter, "ZHANG"). The CC told the UC that ZHANG had requested to see the weapons prior to paying, and ZHANG wanted to travel to the United States to take photographs of the weapons. Later in the investigation, the UC

7

obtained ZHANG's WhatsApp number from the CC to facilitate direct communication between ZHANG and the UC about the order.

22.     On May 29, 2018, the UC began exchanging a series of messages with ZHANG through WhatsApp. During the conversations, ZHANG mentioned his interest in purchasing multiple firearms, including a Carl Gustaf M4 recoilless rifle. ZHANG informed the UC he would be traveling to Phoenix on June 5, 2018, to meet with him and inspect any weapons the UC would be able to provide. Later during the same day, ZHANG sent the UC a digital photo of what appeared to be a computer screen displaying language pertaining to the ITAR. ZHANG digitally circled a portion of the photo that displayed a warning that China, including Hong Kong, was prohibited from receiving exports of defense articles. Following the photo, ZHANG wrote "bad! I saw this file, US government does not sell to Hong Kong." ZHANG also directly provided the UC with his email account, dahaoheshan@163.com.

23.     On June 5, 2018, the UC, the CC, and ZHANG met in-person in Phoenix, Arizona, to discuss the potential order of weapons. The meeting was recorded by audio and video. The UC had determined through written communications with ZHANG that he spoke limited English. As a result, the UC secured an undercover Mandarin-speaking law enforcement agent to listen to the conversation during the meeting and interpret for ZHANG and the UC through a telephone. During the meeting, the UC showed ZHANG an actual M320 grenade launcher, an M4 rifle, and an M16 rifle as proof that the UC could fulfill ZHANG's order. ZHANG and the UC discussed the purchase and export of various munitions, including anti-tank rocket launchers, grenade launchers, and rifles. ZHANG

8

acknowledged to the UC that he would be unable to obtain an export license for the U.S. munitions. After that, the UC asked ZHANG how he (ZHANG) suggested sending the items to China without a license. ZHANG told the UC to break the firearms up into parts and mail all the parts to ports in either Hong Kong or Guangzhou. ZHANG advised that he knew people at the port and importing the items into China without the proper licenses would not be a problem.

24.     At that point, the UC advised that he must charge a "smuggling fee" for the risk and ZHANG agreed to pay a smuggling fee of $25,000. After discussing the smuggling fee, the UC asked the CC if he still wanted to go through with the deal without a license. The CC stated he just wanted to make money. At the conclusion of the meeting, ZHANG and the UC agreed upon a transaction involving six M320 grenade launchers, two M4 rifles, and one Carl Gustaf M4 recoilless rifle. The UC provided ZHANG and the CC with a quote of $75,000 for the requested weapons, which included the "smuggling fee." ZHANG agreed to pay 50% of the quote up front and the remaining balance after inspection and delivery.

25.     I know that an M4 is designed to fire as a fully automatic and semiautomatic assault rifle that typically uses 5.56 mm caliber ammunition, and is included in Category I(b) of the USML. *See* 22 C.F.R. § 121.1 (including in Category I(b) of the USML, "fully automatic firearms to .50 caliber inclusive (12.7 mm)").

26.     I also know that an M320 is a grenade launcher that can be used as a standalone firearm or it can be affixed to an M4 rifle. The M320 is included in Category II(a) of the USML. *See* 22 C.F.R. § 121.1 (including in Category II(a) of the USML, "Guns

9

over caliber .50 (i.e., 12.7 mm), whether towed, airborne, self-propelled, or fixed, including but not limited to, howitzers, mortars, cannons, recoilless rifles, and grenade launchers").

27.    I also know the Carl Gustaf M4 recoilless rifle is a recoilless rifle that typically uses an 84 mm round, and is included in Category II(a) of the USML. *See* 22 C.F.R. § 121.1 (including in Category II(a) of the USML, "Guns over caliber .50 (i.e., 12.7 mm), whether towed, airborne, self-propelled, or fixed, including but not limited to, howitzers, mortars, cannons, recoilless rifles, and grenade launchers").

28.    I know that both the M4 and the M320 are manufactured in the United States. I know that the Carl Gustaf M4 recoilless rifle is manufactured in Sweden.

29.    I received a "blanket" determination from the DDTC dated October 24, 2017, which determines that items that meet the description under Category I(b) and Category II(a) are controlled under the USML. Because the firearms are included in the USML, pursuant to Section 126.1(a) of the ITAR, there is a policy of denial of licenses for the M4, the M320, and the Carl Gustaf M4 recoilless rifle to be exported to China.

30.    After the meeting, the UC and ZHANG agreed to communicate using a messaging application identified as WeChat, a Chinese-based messaging, social networking, and payment method smart phone application, which offers translation services for written communications between English and Mandarin. The following are summaries of subsequent recorded WeChat communications between the UC and ZHANG.

31.    On June 6, 2018, ZHANG informed the UC that upon his return to China he would be going to the Guangzhou airport to "clear the way for the police and customs of

the airport." ZHANG further wrote he had many police friends who will help him and the UC.

32.     On June 10, 2018, the UC requested that ZHANG wire $37,500.00, half of the agreed-upon total invoice, to begin procurement of the munitions. ZHANG agreed to this amount, and the UC provided ZHANG with an account number to an HSI-controlled bank located in Phoenix, Arizona. During a later conversation, ZHANG informed the UC he "applied to the bank to prove that the money was for the purchase of mechanical and electrical equipment." ZHANG sent a message to the UC stating it could take three to seven days for the remittance to arrive due to "International conventions against money-laundering."

33.     On June 11, 2018, ZHANG informed the UC that before the bank would allow him to remit the money, their written contract would need to be changed to reflect a product name other than a weapon. ZHANG further wrote he would be able to send the UC money through PayPal as long as it was under $10,000. ZHANG wrote that any remittance over $10,000 would need to be sent through an "underground bank." The UC asked ZHANG what an underground bank was and ZHANG replied, "illegal remittances." The UC provided ZHANG with an HSI-controlled PayPal account, which is linked to an HSI undercover bank account in Phoenix, Arizona.

34.     On June 12, 2018, ZHANG sent an attachment through WeChat of a document titled "contract." The "contract" listed the buyer as "Guangzhou Eagle Defense Technology Co. Ltd.," and the seller was listed as the UC's undercover company. Below the buyer and seller headings, the "contract" was divided into sections by the titles

"product," "payment," "seller account," "shipping address," "in principle," and "signature." The items listed under "product" included two M4 assault rifles, six M320 grenade launchers, and one "Gustav M4." The total price listed was $48,600 USD. The "contract" also listed a total amount of $75,000, agreed upon by ZHANG and the UC as the total amount, with the smuggling fee. The "shipping address" listed an address in Guangzhou City, Guangdong Province, China, with ZHANG listed as the "recipient." Under the heading "seller account," the UC's bank account information was provided, which listed the UC's bank address as in Phoenix, Arizona.

35.     On June 13, 2018, ZHANG sent a message to the UC stating that ZHANG had sent the UC $10 through PayPal as a test. I confirmed that $10.00 USD was received in the HSI-controlled PayPal account from ZHANG. That same date, the HSI-controlled PayPal account received two more payments for $1,000.00 USD and $3,000.00 USD from ZHANG. Afterward, ZHANG reported he was unable to send any more money through PayPal because PayPal informed him the remittances were suspicious.

36.     On June 14, 2018, ZHANG sent a message to the UC stating that ZHANG had an additional client who requested a Carl Gustaf recoilless rifle. The UC asked ZHANG if he wanted to purchase two Carl Gustaf recoilless rifles, and ZHANG affirmed. ZHANG added that he was working with another client who may be interested in a third Carl Gustaf recoilless rifle, but ZHANG had not yet obtained the order.

37.     On June 29, 2018, ZHANG sent a WeChat message to the UC informing the UC that he remitted $23,000 through his bank to the UC's bank. ZHANG told the UC he would send an additional $10,000 the following Monday. On July 2, 2018, ZHANG sent

a message to the UC requesting a letter drafted by the UC explaining the purpose of the $10,000 remittance. ZHANG explained the letter would be provided to "SAFE" as "proof of the use of 10000." An open source search for SAFE revealed it is an acronym for The State Administration of Foreign Exchange in China. ZHANG provided the UC with the following language to be placed in the letter as the basis for the $10,000 remittance: "We customize the private travel route for Mr. Zhang Jian. He will come to the United States in the 7-8 month of 2018. He himself took on the travel expenses and bought insurance. I charge his travel expenses: $10000. Mr. Zhang Jian's passport number is E81483246." On or about July 3, 2018, the UC sent ZHANG the letter he requested.

38.    On July 6, 2018, an HSI-controlled bank account in Phoenix, Arizona received $9,985.00. According to the wire transfer description, the transfer was conducted by the Agricultural Bank of China from "Jin Pang." Based on my review of undercover communications between ZHANG and the UC, I know that ZHANG identified his wife as "Jin Pang." I believe the wire transfer was reduced by fifteen dollars because ZHANG's bank likely charged a transaction fee. Later, on July 6, 2018, the UC informed ZHANG that the UC received $10,000 in his bank account. ZHANG replied "very good. I think 23k will be available on Monday."

39.    On July 13, 2018, ZHANG sent a message to the UC stating he remitted an additional $20,000 to the UC. The UC asked ZHANG about the $23,000 that ZHANG claimed he had already sent and ZHANG replied, "If you get 23K, it's yours, too." Later during the conversation, ZHANG sent a photo of what he described as a certificate of transfer for $20,000 from Hong Kong. I reviewed the certificate, which was titled,

"Application for Remittance," and displayed the name of the bank as "Hang Seng Bank." I also observed a remittance amount for $20,000, the UC's undercover company name, and the HSI-controlled bank account number displayed on the certificate. I know that Hang Seng Bank is a Hong Kong-based bank with offices in the PRC.

40.     Between July 14, 2018, and July 16, 2018, ZHANG and the UC discussed the price for the additional Gustaf via WeChat messaging. During their conversation, they agreed upon a price of $25,000 for the additional Gustaf in addition to a $10,000 smuggling fee.

41.     On July 16, 2018, I reviewed the HSI-controlled bank account and confirmed that two remittances, one of $20,000.00 USD and one of $23,000.00 USD, were received. According to the wire transfer descriptions for both remittances, the $20,000.00 was sent by the "Hang Seng Bank" from "Wendy Ong," and the $23,000.00 was sent from the "China Merchant's Bank" from ZHANG. An HSI agent conducted a check of government indices and but could not find any information on Wendy Ong. On July 16, 2018, the UC informed ZHANG that the UC received $43,000.

42.     Pursuant to a search warrant issued by U.S. Magistrate Judge Eileen S. Willet on July 17, 2018, in the District of Arizona (Warrant No. 18-9291MB), I have reviewed the contents of an email account the CC used to communicate with the UC, emaxorders@gmail.com. During my review of the CC's email records, I discovered an email conversation between the CC and ZHANG that occurred on or about May 12, 2018.

43.     On or about May 12, 2018, ZHANG, using email account dahaoheshan@163.com, emailed the CC the following:

14

I saw email
They want to carry out legitimate international trade in weapons
I already told you about the procurement process
But you don't listen to me

1.      I cannot use the information of the Hong Kong government, which is the
end-user certificate (EUC)
2.      The Hong Kong government is not qualified to buy rocket launchers
because the troops in Hong Kong are Chinese troops.
3.      If you trade in legal arms trade, you have to return the money back to me
because money must be remitted to them from the end user's bank account.
4.      We want to think of other ways
5.      I don't know Hong Kong police. I don't have a Hong Kong company.

44.     In response, later that day, the CC emailed ZHANG and advised, "WE ARE

TALKING ABOUT JUST THE 4 RIFLES FOR NOW!"

45.     In response, ZHANG emailed the CC the following:

I do not have a Hong Kong company
I don't know Hong Kong police
Can only write my friend's name and address

46.     ZHANG followed up with an email to the CC which stated the following:

Flat F, 19/F, Block 5, Uptown, 600 Castle Peak Rd, Hung Shui Kiu, Yuen Long N.T.
Hong Kong
Ms. Ong Wendy T
Tel: +86 18988922188
China Eagle Defense
18988922188@163.com

47.     Responding to ZHANG, the CC emailed the following:

YOU MAKE UP A LETTER HEAD AND USE YOUR NAME AS HK SECRET
POLICE WITH THIS ADDRESS AND WE ARE CLEAR TO GO!

Flat F, 19/F, Block 5, Uptown, 600 Castle Peak Rd, Hung Shui Kiu, Yuen Long N.T.
Hong Kong
General Zhang Jian – HONG KONG SECRET SERVICE
Tel: +86 18988922188

15

48.   ZHANG responded to the CC:

This lie is dangerous
Can't do this
Because the U.S. embassy in Hong Kong will go to the Hong Kong government to
verify this
You do not understand

49.   Based on the investigation, I believe the email conversation between ZHANG and the CC was in response to the May 11, 2018, email the UC sent to the CC in which the UC advised the CC about the requirement for an export license and the request for End User Certificate information.

50.   Between July 16, 2018 and the present, ZHANG and the UC have continued to discuss the timing of the remaining payments, the logistics regarding ZHANG's travel to the U.S. to inspect the requested USML items, and the methods of shipping those items to the PRC.  For example, on July 17, 2018, ZHANG wrote to the UC, "You first send an M320 When I received it Prove that the mode of transport is reliable."  ZHANG further wrote, "I mean, send 1 first. I received it in Guangzhou. This is a suggestion from a police friend. He wants to test customs."  Later on in the conversation, the UC informed ZHANG there would be a risk of customs finding the weapons.  ZHANG replied, "Guangzhou Customs and the police, I have bribed the leader I am worried about US Customs and Police."

## CONCLUSION

51.   The facts stated above show that there is probable cause to believe that beginning on or about May 29, 2018, and continuing through on or about July 17, 2018, in

the District of Arizona and elsewhere, ZHANG bought two M4 rifles, two Carl Gustaf M4 recoilless rifles, and six M320 grenade launchers, prior to exportation, knowing them to be intended for exportation without a license in violation of AECA, Title 22, United States Code, Section 2778, and ITAR, Title 22, Code of Federal Regulations, Parts 120, *et seq.*, laws and regulations of the United States, in violation of 18 U.S.C. § 554(a).

52.    Additionally, the facts stated above also show that there is probable cause to believe that beginning on or about June 13, 2018, and continuing through on or about July 16, 2018, in the District of Arizona and elsewhere, ZHANG did knowingly transmit and transfer $56,995.00 in U.S. currency from a place outside of the United States, i.e., the People's Republic of China, to a place inside the United States, i.e., Arizona, with the intent to promote specified unlawful activity, to wit, the smuggling of items from the United States contrary to laws and regulations of the United States, in violation of 18 U.S.C. § 1956(a)(2)(A).



CHRISTOPHER TODD
Special Agent
Homeland Security Investigations


Sworn to and subscribed before me on this 16th day of August, 2018.


HONORABLE BRIDGET S. BADE
United States Magistrate Judge

17